## ENTERPRISE CO. v. TAYLOR.
### No. 3214.

Court of Civil Appeals of Texas. Beaumont.

Jan. 13, 1938.

Orgain, Carroll & Bell, of Beaumont, for appellant.

Fred A. White, of Port Arthur, for appellee.

WALKER, Chief Justice.

On the 2d day of March, 1936, appellee, Miss Genevieve Taylor, was secretary to the county agriculture agent and county home demonstration department, of Jefferson county; and Miss Byers was an employee of the port commission of the city of Beaumont. In the morning edition of the Beaumont Enterprise of March 3, 1936, a daily newspaper published by appellant, the Enterprise Company, was published the following article:

"Two Secretaries of Public Officials Jailed After Fighting Four Policemen

"Secretaries to two public officials, one county and one city, were in city jail last night charged with drunkenness after they had failed in a battle royal with four police officers.

"As the two young women resisted arrest by two policemen so forcibly that the outcome of the battle was in doubt, two other police officers drove up and helped get them to the station. One officer suffered a severely scratched chin.

"They were arrested at a Log Cabin sandwich stand after complaint had been made to the police department. They spent the night in the jailhouse screaming for aid and intimating in colorful language that they wanted somehow, to get out of jail.

"Given their chance at the telephone, they put in a call. It was understood that they called not their bosses, but a county peace officer. Somehow, or other, though, they stayed in jail."

On the 1st day of May, 1936, appellee instituted this suit against appellant, alleging that she was one of the secretaries referred to in this article; that the charges made against her were false, and constituted a libel; that the publication was made maliciously; and, as a proximate result, she had suffered actual and exemplary damages. Appellant answered, pleading that the charges made by the article were true or substantially true, and denied malice. On the verdict of a jury answering special issues, judgment was entered for appellee against appellant for $3,000 actual damages and $2,500 exemplary damages.

■ In connection with the issue submitting actual damages, the court charged the jury, in part, as follows:

"You are instructed that you can now allow plaintiff damages for the publication of the following portions of said article, towit: 'Two Secretaries of public officials jailed,' 'Secretaries of Two Public Officials, one county and one city, were in city jail last night charged with drunkenness,' and 'They were arrested at a Log Cabin sandwich stand after a complaint made to the police department.'"

This charge was given on the theory that the facts thus taken from the consideration of the jury were established as true. Appellant excepted to the refusal of the court to withdraw from the jury, in assessing actual damages, the following additional charge which was contained in the published article: "Given their chance at the telephone, they put in a call. It was understood that they called not their bosses, but a county peace officer. Somehow, or other, though, they stayed in jail." Appellant was entitled to this charge. This statement in the published article was established as true, and about it there was no controversy. Article 5431, R.S.1925, as amended by Acts 1927, c. 80, § 1, Vernon's Ann.Civ.St. art. 5431, provides that the truth of the statement, or statements, in a published article, alleged

to be libelous, "shall be a defense to such action." The following authorities give a literal application to this statute: Moore v. Davis, Tex.Civ.App., 16 · S.W.2d 380; Times Publishing Company v. Ray, Tex. Civ.App., 1 S.W.2d 471; Lundberg v. Brownsville Herald Publishing Company, Tex.Civ.App., 66 S.W.2d 375; Houston Press Co. v. Ferguson, Tex.Com.App. 12 S.W.2d 125; Ferguson v. Houston Press Co., Tex.Civ.App., 1 S.W.2d 387; Clough v. News Publishing Company, Tex.Civ. App., 58 S.W.2d 1033; First State Bank of Lyford v. Parker, Tex.Civ.App., 28 S. W.2d 269; Wheless v. W. Y. Davis & Son, Tex.Civ.App., 122 S.W. 929, error refused; Democrat Publishing Company v. Jones, 83 Tex. 302, 18 S.W. 652; Cotulla v. Kerr, 74 Tex. 89, 11 S.W. 1058, 15 Am. St.Rep. 819; 27 Texas Jurisprudence par. 29, p. 635.

■ Appellant also excepted to the refusal of the court to withdraw from the jury certain other charges made by the published article. Appellant was not entitled to these additional instructions; the truth of the charges made by the published article in these respects was a fact issue for the jury, waived because not requested. Ormsby v. Ratcliffe, 117 Tex. 242, 1 S.W.2d 1084.

■ We sustain appellant's exception that the verdict for $3,000 actual damages and $2,500 exemplary damages, on the facts of this case, was excessive. Appellee and Miss Byers had been friends for a long time, and it was their custom when visiting each other to drink whisky, and other intoxicating liquors; not excessively, but as cocktails, etc. On the afternoon of the 2d of March, 1936, appellee visited Miss Byers in her apartment and cocktails were served; Miss Byers said that appellee took four or five drinks and one bottle of beer, appellee testified that she took one or possibly two drinks. While they were there at Miss Byers' apartment, a Mr. Smith, a friend of Miss Byers, dropped in for a visit with them; again drinks were prepared and served. They left Miss Byers' apartment in her car, and drove to a Log Cabin sandwich stand where Miss Byers ordered something to eat; she did not like the way it was served, and threw it upon the ground breaking the dishes. Miss Byers was drunk and abused the attendants at the sandwich stand. Mr. Smith tried to quiet her, tried to drive the car away, but Miss Byers resisted his efforts.

Appellee was sitting on the back seat of the car and took no part in the controversy, except to say that Miss Byers was right. A call was sent in to the police department and two officers were sent out to restore order. They tried to get Miss Byers and Mr. Smith to leave, which Miss Byers refused to do; Mr. Smith left by himself, leaving Miss Byers and appellee in the automobile. The officers tried to arrest Miss Byers and she resisted arrest; two other officers came to their assistance; finally Miss Byers was put in her own car handcuffed, and two officers sat with her on the back seat. The officers found three whisky bottles in the car. As we understand the record, appellee tried to drive the police car but was unable to do so; she went to the police station in the car with Miss Byers and the police officers. One of the police officers said that appellee was drunk; when this testimony was excluded, he then said that he smelled whisky on appellee. At the police station both girls were "Booked" on a charge of drunkenness, and confined in the city jail. In the night, appellee was permitted to 'phone the sheriff at her request; she made no request to 'phone her "boss." About 3:30 a doctor was called to treat appellee, called at her request and paid by her. When the doctor left, as testified to by one of the officers in charge, he said that appellee was sober enough to go home, and she was released. She spent the balance of the night in Miss Byers' apartment. The next morning Miss Byers was released and went to her apartment; we quote as follows from appellee's testimony:

"Q. Did you and Miss Byers have an agreement about what you would do after you got out? A. I don't know that it was an agreement; Miss Byers asked me to call Mr. Pollock.

"Q. Did you call him? A. I did.

"Q. What did you ask him to do? A. I told him that she was at the police station.

"Q. Did you tell him where you were? A. Yes, I did.

"Q. Where were you? A. I was at her home.

"Q. Did you ask him to come out there? A. I didn't, but I understood that he was going to the police station to see what he could do about her situation.

"Q. What time did she get out? A. She came home about nine thirty the next morning; nine thirty or ten.

"Q. Did Artie come out there after she got there? A. He brought her home.

"Q. Now, I wish you would tell the jury everything that you all said to Artie and everything that Artie said to you all prior to the time he left you there in Kate Byers' home that morning. A. When Mr. Pollock came out he said, 'Now, tell me all about what happened.' So we told him.

"Q. What did you tell him as to what happened? A. What I have told in my preceding testimony.

"Q. What is that? A. You know, about what occurred out there at the Log Cabin; and so we told him about that and he said, 'Well, I don't know what can be done.' He says, 'I have talked to Mr. Hillard and he is determined to file his complaint against you,' and he said, 'But I will go and try again; I will go and see him again and see what can be done. Maybe he has cooled off by now,' and so we told him to do that.

"Q. Didn't you tell him to do anything that he could do to end the controversy? A. We told him to do what he could to quiet it.

"Q. Then you told him that you had been drinking? A. No. I didn't tell him I had been drinking.

"Q. You didn't tell him that? A. No, I didn't.

"Q. You all told him you were drunk and raising a row out there? A. No, sir.

"Q. You all told him that a complaint had been filed against you and you were supposed to be in court at nine o'clock that morning? A. I told him that I also told him I had called the desk sergeant and told him I couldn't appear but I was going to be there the next morning.

"Q. You told him to see what he could do about that? A. No, that wasn't specified at all.

"Q. Miss Byers didn't say anything to him about it? A. No, she didn't that I recall at all.

"Q. Isn't it a fact that she told him to do anything necessary, to plead you guilty and pay your fine? A. To do what he could to help with the situation, clear it up.

"Q. Well, you learned shortly after, the early part of the morning, that he had pleaded you guilty? A. Mr. Pollock—

"Q. And had paid your fine? A. Yes, Mr. Pollock returned to Miss Byers' home said, 'I don't know whether you are going to approve of my action, but I thought it was the best thing to do under the circumstances.' He sat there a while and finally said, 'I went down there and entered a plea of guilty to the charge and somebody else paid the fine;' and there was nothing to be said about it."

Officer Joe Fisher, who assisted in the arrest, testified:

"Q. Well, what did you see there, Mr. Fisher? A. Well, there was two girls, this one and another one, and a man there when we walked up. The man seemed to be in company with them and he says, 'I can't do anything with them' and he disappeared.

"Mr. White: Was that in the presence of Miss Taylor and Miss Byers the other party? A. Yes, sir.

"Q. What did you try to get them to do, the two girls? A. Well, Miss Byers was sitting with her feet hanging out the front door on the right hand side of the car she said belonged to her.

"Q. What did she say she was going to do? A. Said she wasn't going to do anything; she was going—

"Q. What did you try to do with the two of them? A. Tried to put them in our car.

"Q. Well, were you able to do that? A. No, sir; I got the other one in, but she passed right on through and went out on the opposite side.

"Q. Well, what did this one do? A. She would get in the way and push the door, close the door when I would open it to put the other girl in there. * * *

"Q. I'll ask you whether or not there was any liquor in this automobile? A. There was.

"Q. How much? A. There was three pint bottles in there and there was about a third of the whiskey in each one of them.

"Q. What became of them? A. I poured the whiskey in the sewer in the back of the station and throwed the bottles in the garbage can."

Capt. H. A. Downey, in charge of the police station that night, testified:

"Q. On the night of March 2, 1936, do you recall an occasion in which Miss Taylor and Miss Byers were brought to the City jail? A. Yes, sir, I do.

"Q. Where were you at the time that they were brought there? A. At the desk.

"Q. That's on the inside of the building? A. Yes, sir.

"Q. Did you see these parties when they were brought in? A. I did.

"Q. Have you had any experience with drunk people? A. Plenty.

"Q. Can you tell when a person is drunk? A. I think I can.

"Q. I ask you as to whether Miss Taylor was drunk? A. She was drunk. * *

"Q. Why did you call a doctor? A. She requested a doctor, and any prisoner at the city jail that requests a doctor we send for one.

"Q. Did she specify a doctor? A. No, sir.

"Q. I'll ask you where she was when you called the doctor? A. In the cell.

"Q. Had she just used the telephone? A. I don't remember.

"Q. Captain, where was she when she fainted? A. I didn't ever see her faint.

"Q. Did she faint? A. I don't know; I didn't hear it; that's the first time I heard of it.

"Q. In your report to the chief did you state that this girl was sick there in jail and fainted and you called Dr. Taylor Walker down there? A. No, sir, I reported to the chief that she said she was sick and I had called the city doctor, and when the doctor came up I directed him upstairs, and I asked him what her condition was and if she was sober enough to drive a car home and he said yes."

Appellee denied that she was drunk.

Appellee never subsequently made any effort to have the plea of guilty set aside. In our judgment, on this statement of facts, a verdict for $3,000 actual damages can be explained only on the ground that the jury considered and gave great weight to the statements in the published article, established by the testimony to be true; even if these statements were properly before the jury, the judgment is excessive. It necessarily follows that the verdict for $2,500 exemplary damages is also without support.

In her brief, appellee says:

"The gravamen of the article complained of by the Appellee in the case at bar is first, the headline, 'Two secretaries—fighting four police officers'; second, 'After they had failed in a battle royal with four police officers'; third; 'As the two young women resisted arrest by two po-

licemen so forcibly that the outcome of the battle was in doubt, two other police officers drove up and helped get them to the station. One officer suffered a severely scratched chin'; fourth; 'They spent the night in the jailhouse screaming for aid and intimating in colorful language that they wanted somehow, to get out of jail; fifth; 'Somehow, or other, though, they stayed in jail.'"

From the issues thus suggested should be taken the statements in the published article, established as true by the uncontroverted testimony.

For the errors discussed, the judgment of the lower court is reversed and the cause remanded for a new trial.